UNITED STATES of America

v.

Serge KOWALCHUK, a/k/a Serhij Kowalczuk

Appeal of Serge KOWALCHUK.

No. 83–1571.

United States Court of Appeals, Third Circuit.

Argued April 23, 1984.

Argued In Banc May 6, 1985.

Decided Sept. 23, 1985.

John Rogers Carroll (argued), Carroll & Carroll, Philadelphia, Pa., for appellant, Allison Pease, on brief.

Neal M. Sher, Director, Michael Wolf, Deputy Director, Jeffrey N. Mausner (argued), Samuel Rosenthal, (argued), U.S. Department of Justice, Washington, D.C., for appellee.

Before ALDISERT, Chief Judge, SEITZ, ADAMS, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM, SLOVITER, BECKER, MANSMANN, and ROSENN, Circuit Judges

## OPINION OF THE COURT

ROSENN, Circuit Judge.

The Government instituted proceedings in the United States District Court to revoke and set aside an order admitting the defendant, Serge Kowalchuk, to citizenship because his naturalization had been illegally procured by concealment of a material fact or by willful misrepresentation.[1] In essence, the complaint alleged that the defendant failed to disclose in response to questions during the admissions procedure certain material facts: his membership in and employment by the Ukrainian militia and his residence in Lubomyl, Poland, during the war years 1941 and 1942. The

---

1. The Government filed its complaint under section 340(a) of the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. § 1451(a) (1982). The district court exercised jurisdiction pursuant to 8 U.S.C. § 1451 (1982) and 28 U.S.C. § 1345 (1982). This court has appellate jurisdiction under 28 U.S.C. § 1291 (1982).

complaint thus alleged that he entered this country unlawfully, procured his permanent residence by fraud, and obtained his naturalization illegally.

The district court, 571 F.Supp. 72, concluded that the defendant illegally procured his citizenship by entering this country with an invalid visa. It had two separate grounds for this conclusion. First, the defendant was not a genuine refugee of concern to the International Refugee Organization (IRO) and therefore was ineligible for admission under the Displaced Persons Act of 1948 (DPA), Pub.L. No. 80–774, 62 Stat. 1009 (1948) (codified at 50 App.U.S.C. §§ 1951–1965 (1982)). Second, the defendant was ineligible under section 10 of the DPA because he had made material misrepresentations to obtain the visa. The court accordingly revoked the defendant's citizenship and canceled his certificate of naturalization. We affirm.

## I.

These revocation proceedings have their genesis in Serge Kowalchuk's activities shortly after the German military forces occupied Lubomyl in June 1941. Within two or three weeks after occupation, the Germans organized the Ukrainian schutzmannschaft.[2] Shortly thereafter, the defendant, then an able-bodied twenty-one year old man, suitable for military service, successfully sought out the collaborating mayor of the city for employment.

His first assignment was to the food distribution center serving government employees and the militia. He apparently was in charge, for the only other employee there was his assistant. In about one and one-half months, he was assigned to the schutzmannschaft headquarters across the street. He worked at the food distribution center in the mornings and at militia headquarters in the afternoons. Apparently impressed by his services, his superiors, in August 1941, sent the defendant, according to his testimony, elsewhere for special training at no expense to him. He was the only selectee from the Lubomyl area in a class of between 45 and 50. Upon the conclusion of his six months "additional training in local administration" and German language study, he received a certificate of completion and returned to his duties with the Lubomyl schutzmannschaft. His duties now were full time with the militia[3] until he fled Lubomyl with the retreating German army. As was the case with only the commandant and deputy commandant, defendant had his own private office and occupied these quarters for almost three years, the remainder of the Nazi occupation.

### A.

To fully appreciate the defendant's role with the schutzmannschaft, an understanding of its function and its crucial importance to the Germans in carrying out the policies of the German army in the Ukraine may be helpful. The Germans organized indigenous personnel and formed them into auxiliary forces. They organized the Lubomyl schutzmannschaft into precisely such a body. These auxiliary forces enabled the Nazis to carry out their repressive and brutal policies and, at the same time, to wage an aggressive military campaign. As the district court found, "the occupying authorities did rely upon 'indigenous forces,' i.e., segments of the local population, to carry on the functions of government and to enforce the observance of restrictive edicts." *United States v. Kowalchuk*, 571 F.Supp. 72, 80 (E.D.Pa. 1983).

According to Professor Raul Hilberg, a leading authority on the Holocaust produc-

2. The Lubomyl militia was officially known as the schutzmannschaft but was interchangeably referred to by the witnesses as the Lubomyl militia or police force. Prior to the schutzmannschaft, Lubomyl had no police force or militia.

3. Mykola Kowalchuk, defendant's brother, testified that after his brother's supplemental training the defendant was given additional duties in the militia. Mykola further acknowledged at trial that in his 1981 deposition he testified that his brother at times wore a uniform, as did all the schutzmannschaft.

ed as an expert witness by the Government at trial, "the availability of an auxiliary force made of Ukrainian personnel was of crucial importance to the Germans, particularly because without them nothing at all could have been accomplished" in carrying out the policies of the German army in the occupied territories. Dr. Hilberg further testified that the sheer numbers of those killed in the liquidation of the Jews required the use of indigenous personnel. As the district court found, the magnitude of the brutal plan to liquidate in one day the 5,000 to 6,000 Jews living in Lubomyl required not only the German soldiers available, but also "significant numbers of Ukrainian militiamen to assist them in escorting the Jews from the ghetto to the execution site, and to prevent escapes." *United States v. Kowalchuk*, 571 F.Supp. at 81. The district court found

What the evidence does establish with the requisite clarity and conviction is that the Lubomyl schutzmannschaft regularly and routinely enforced the martial law restrictions imposed by the Germans, including beating Jews found outside the ghetto after curfew, beating or severely reprimanding Jews who failed to wear the required insignia, assisting the Germans in confiscating valuables from the Jewish inhabitants, arresting and participating in the harsh punishment of persons involved in black-market activities or subversive activities hostile to the German occupation forces; and that the

defendant was aware of the responsibilities assigned to the schutzmannschaft, and occupied a responsible position, albeit largely clerical, within that organization.

... It is apparent ... that members of the schutzmannschaft accompanied the German gendarmes on the many occasions disclosed by the testimony when persons were rounded up for forced labor, or arrested for various supposed infractions; that many of the persons thus apprehended were killed soon afterward; and that members of the schutzmannschaft were present during such executions.

571 F.Supp. at 81.

The district court concluded that although the evidence did not disclose, with the requisite clarity, that the defendant personally participated in any individual atrocities,[4] the court nonetheless found:

[T]he evidence as a whole leaves little doubt that everyone associated with the schutzmannschaft, including the defendant, must have known of the harsh repressive measures which the schutzmannschaft were carrying out pursuant to German direction.

571 F.Supp. at 81.

### B.

When the Germans retreated from the Ukraine, the defendant elected to flee with them to Czechoslovakia.[5] The defendant

---

4. The government produced three non-Soviet witnesses who testified at the trial to the defendant's personal participation in atrocities in Lubomyl. Although the trial judge expressed confidence that these witnesses "testified honestly," he believed there were good reasons for questioning the reliability of their evidence. He viewed the testimony of six Soviet witnesses, who testified by videotape deposition about Kowalchuk's personal participation in atrocities in Lubomyl, with greater skepticism on the ground that they had been selected by the Soviet government and were under its control.

5. The record in this case leaves no doubt that the defendant departed voluntarily. The defendant testified that he left on the evacuation train with his family. (A 1335) (A 1170–71, 1335) Mykola amplified this testimony on cross-examination with the following:

Q. Sir, on the fragebogen ... is there a section ... in which you said you were forcibly transported by the Germans to Czechoslovakia? You used the words "forcibly transported;" is that correct?
A. Yes.
Q. When in fact, as you previously testified, it was your own choice to go or not to go; is that correct?
A. Yes.
(A 1173) In its brief to this court, the Government notes, among other misrepresentations of the defendant, "[he] also claimed that he had been forcibly transported by the Germans (GA 26, 30; Gov't Ex. 15A, ¶ 42) when in fact, as he admitted at trial, he voluntarily left Lubomyl (A 1255)."

and his younger brother, Mykola, ultimately arrived at a displaced persons camp near Salzburg, Austria. After spending four years there, the defendant applied in November 1947 for the necessary clearance certifying that he was a refugee "of concern" to the IRO. To obtain this certification, the defendant executed a required detailed personal history form (the CM/1 form). The defendant stated on this form that during the German occupation of the Ukraine, he lived in Kremianec, not Lubomyl, and that he worked there as a tailor. He concealed his service with the Lubomyl militia during the war. The district court found: "In his CM/1 personal-history form, the defendant intentionally misrepresented and/or concealed his residence in Lubomyl and his employment with the town government there during the German occupation." 571 F.Supp. at 81.

The defendant then took the next step to gain admission to the United States as a permanent resident. For this purpose, he submitted an additional personal history questionnaire, the "fragebogen," together with his IRO documentation, to representatives of the United States Displaced Persons Commission (DPC). After the required investigation, he was duly certified in 1949 as meeting the eligibility requirements of the DPA. He then applied to the vice consul of the United States at Salzburg, Austria, and on December 29, 1949, he obtained a visa for admission to the United States for permanent residence. His petition for naturalization was granted on November 30, 1960, and he was admitted to citizenship.

The fragebogen opened with the admonition that "all questions must be answered and all information must be complete" and concluded with Kowalchuk's signature and his attestation that "if it is found to be untrue, incomplete, or misleading in any point, I may be denied entry into the United States."

Kowalchuk's responses to the fragebogen were false and misleading in the following respects: (1) Kowalchuk concealed his membership in the Ukrainian schutzmannschaft by falsely stating that he was a tailor's assistant in Kremianec from 1939 to 1944. (2) He concealed his residence in Lubomyl by falsely stating that he had lived in Kremianec from 1939 to 1944. (3) He only listed attendance at a trade school in Chelm, Poland, between 1936 and 1939 and concealed the fact that he was sent, as he now claims, for special schooling in 1942 and 1943 by the Nazi-controlled government of Lubomyl. (4) He concealed his voluntary departure with the retreating German military forces from Lubomyl to Czechoslovakia, by falsely stating that he left his homeland because he was forcibly transported by the Germans. (5) In response to a question concerning membership in any political, non-political, or paramilitary organization, he falsely replied "none," thereby concealing his membership in the schutzmannschaft.[6]

## II.

On appeal, Kowalchuk argues that the district court committed reversible error in two respects: (1) its legal conclusions are not supported either by its own factual findings or by the evidence of record; and (2) his due process rights were violated because he was unable to investigate and interview "potentially favorable witnesses to him" residing in Soviet-controlled territory.

The Government sued under section 340(a) of the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. § 1451(a) (1982) to have Kowalchuk denaturalized. This statute provides for the revocation of an order admitting a person to citizenship if such order and naturalization certificate "were illegally procured or were procured by concealment of a material fact or by willful misrepresentation." To obtain a

---

**6.** Although the Government's complaint charged only misrepresentations concerning the defendant's militia membership and his residence in Lubomyl, it is undisputed that the defendant also failed to disclose on the fragebogen his special training and misrepresented his voluntary flight from Lubomyl with the Germans.

grant of citizenship legally, an applicant must have resided in the country for at least five years after having been lawfully admitted for permanent residence pursuant to a valid visa. 8 U.S.C. §§ 1181(a) and 1427(a)(1) (1982).

Kowalchuk entered the United States under a visa issued pursuant to the DPA quota structure at that time. The DPA permitted increased immigration into the United States of eligible persons displaced by World War II. To gain lawful admission to the United States for permanent residence under the DPA, the applicant first had to establish that he was a displaced person or a refugee of concern to the International Refugee Organization (IRO). See DPA, § 2(b). The IRO guidelines excluded from their concern any person who either "assisted the enemy in persecuting civil populations ..." or "voluntarily assisted the enemy forces ... in their operations against the United Nations." Finally, the DPA provided that anyone who made a willful misrepresentation for the purpose of obtaining a visa would be inadmissible. Thus, a person not eligible for refugee or displaced person status under the IRO Constitution or guidelines or who had made a material misrepresentation on his visa application could be denaturalized under section 1451(a). *See Fedorenko v. United States*, 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981).

### III.

Because citizenship in this nation is a precious right, once conferred, the Government bears "a heavy burden of proof" in a denaturalization proceeding. *Costello v. United States*, 365 U.S. 265, 269, 81 S.Ct. 534, 536, 5 L.Ed.2d 551 (1961), *quoted in Fedorenko v. United States*, 449 U.S. at 505, 101 S.Ct. at 746. To revoke a grant of citizenship, the evidence must be clear, unequivocal, and convincing. *Schneiderman v. United States*, 320 U.S. 118, 125, 63 S.Ct. 1333, 1336, 87 L.Ed. 1796 (1943); *see also United States v. Riela*, 337 F.2d 986, 988 (3d Cir.1964). "Any less exacting standard would be inconsistent with the impor-

tance of the right that is at stake...." *Fedorenko v. United States*, 449 U.S. at 505–06, 101 S.Ct. at 747.

Although the burden of proof upon the Government in a denaturalization proceeding is heavy, a certificate of citizenship is not immune from challenge. It is "an instrument granting political privileges, and open like other public grants to be revoked if and when it shall be found to have been unlawfully or fraudulently procured." *Johannessen v. United States*, 225 U.S. 227, 238, 32 S.Ct. 613, 615, 56 L.Ed. 1066 (1912). As the Court in *Fedorenko* aptly observed, the cases have also recognized that an applicant for citizenship must *strictly comply* with all the congressionally imposed prerequisites to the acquisition of citizenship.

Failure to comply with any of these conditions renders the certificate of citizenship "illegally procured," and naturalization that is unlawfully procured can be set aside. As we explained in one of these prior decisions:

> An alien who seeks political rights as a member of this Nation can rightfully obtain them only upon terms and conditions specified by Congress ...
>
> \*   \*   \*   \*   \*   \*
>
> "No alien has the slightest right to naturalization unless all statutory requirements are complied with; and every certificate of citizenship must be treated as granted upon condition that the government may challenge it ... and demand its cancellation unless issued in accordance with such requirements."

*Fedorenko*, 449 U.S. at 506, 101 S.Ct. at 747 (quoting *United States v. Ginsberg*, 243 U.S. 472, 475, 37 S.Ct. 422, 425, 61 L.Ed. 853 (1917)) (additional citations omitted).

### IV.

Kowalchuk's first step to lawful entrance into the United States as a permanent resident under the DPA required that he establish himself as a displaced person

or refugee of concern to the IRO. The district court found that the defendant was not "of concern to the IRO" because he "voluntarily assisted the enemy forces," a determination that, under the Constitution of the IRO, would have excluded the defendant from eligibility as a bona fide refugee or displaced person. Section 2(b) of the DPA incorporated the definition of a displaced person set forth in the IRO Constitution. Michael R. Thomas, chief eligibility officer for the IRO in 1948, and co-author of the *IRO Manual for Eligibility Officers*, testified that membership in a police force or militia raised a presumption of voluntary assistance to the enemy. These forces "freed the enemy from using its own people." A.P. Conan, employed by the DPC between 1948 and 1952, served a stint as a senior officer in charge of the commissioner's activities for the British Zone. He essentially reviewed the eligibility of those whose applications the Commission proposed to reject. He testified that an applicant who had served in the Ukrainian schutzmannschaft would have been rejected unless he overcame the presumption against his eligibility by showing that his service was involuntary, and that he had not committed atrocities or persecuted any person on the ground of religion, race, or national origin.

Professor Raul Hilberg testified that the "German forces were totally insufficient to undertake the policies of Nazi Germany in the occupied territories," and that the assistance of an auxiliary force of Ukranian personnel was "of crucial importance." The importance of those forces was acknowledged by the IRO, which in Part II Appendix IV of Provisional Order 42 defined "enemy forces" to include "police, paramilitary and auxiliary organizations." The district court also observed:

It is impossible to avoid the inference that the defendant had found favor with the Nazi occupiers of Lubomyl, and was being trained for even greater service in the future.

If the defendant's activities had been innocuous as he claims, there would have been little reason for him to leave Lubomyl with the retreating Germans.

571 F.Supp. at 76.

■ The provisions of the IRO constitution,[7] and the testimony of Thomas, Conan, and Hilberg support the district court's findings and convincingly demonstrate that the defendant's voluntary membership in the Ukrainian schutzmannschaft constituted voluntary assistance to the enemy.

The district court also found that Serge Kowalchuk "assisted the enemy in persecuting civilian populations," an alternative basis for its conclusion that the defendant was not a bona fide refugee of concern to the IRO. We do not need to reach this issue. Thus, the defendant's citation to *U.S. v. Sprogis,* 763 F.2d 115 (2d Cir.1985) is irrelevant.

**V.**

A grant of citizenship may also be revoked if it was "illegally procured or ... procured by concealment of a material fact...." 8 U.S.C. § 1451(a) (1982). Unless the preconditions to naturalization are met, citizenship is "illegally procured" and may be revoked. *Fedorenko v. United States,* 449 U.S. 490, 506, 101 S.Ct. 737, 747, 66 L.Ed.2d 686 (1981). To obtain a grant of citizenship, an applicant must have entered the United States pursuant to a valid visa. An applicant ineligible under the law may not obtain a valid visa.

Kowalchuk obtained his visa and entered this country under the provisions of the DPA. The Act enumerated certain auto-

7. The Constitution of the IRO, Annex I-Part II, reprinted in Chapter VI of the Manual, enumerates categories of persons who will not be the concern of the organization. Section 20 thereof excludes persons who can be shown "to have voluntarily assisted the enemy forces ... in their operations against the United Nations." A reading of sections 22 and 27 reveals that "as-

sistance to the enemy shall be presumed to have been voluntary" by a member of either "the police, para-military [or] auxiliary organisations." Once an applicant has joined one of such organizations, the only answer for an applicant under the language of section 27 is "to disprove the voluntary nature of his enlistment."

matic exclusions from eligibility. Section 10 stated:

> No eligible displaced person shall be admitted into the United States unless there shall have first been a thorough investigation and written report ... regarding such person's character, history, and eligibility under this Act. *The burden of proof shall be upon the person who seeks to establish his eligibility* under this Act. Any person who shall willfully make a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person shall thereafter not be admissible into the United States. (Emphasis added.)

■ In this case, it is undisputed that Kowalchuk "wilfully ma[d]e a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person." Kowalchuk argues, however, that the misrepresentations about his wartime activities were not "material." [8] We disagree.

### A.

In *Chaunt v. United States*, 364 U.S. 350, 81 S.Ct. 147, 5 L.Ed.2d 120 (1960), the Government attempted to revoke the petitioner's citizenship on the ground that he had made several misrepresentations in his application for citizenship. The district court cancelled the petitioner's naturalization, and the court of appeals affirmed. The Supreme Court reversed, finding that Chaunt's misrepresentations were not ma-

terial. At issue was Chaunt's failure to reveal arrests that were made more than five years prior to the time of naturalization. The Court stated that "[t]he totality of the circumstances surrounding the offenses charged makes them of extremely slight consequence," *id.* at 354, 81 S.Ct. at 150 and therefore would not of themselves have provided a ground to deny citizenship. The Court also rejected the Government's argument that had it known of the arrests it might have investigated Chaunt further and might well have discovered a link between him and the Communist Party, explaining that the information that Chaunt had disclosed revealed a more substantial nexus with the Communist Party than the undisclosed arrests did. *Id.* at 355, 81 S.Ct. at 150.[9] The Court then concluded that the decision to denaturalize Chaunt should be reversed because

> the Government ... failed to show by "clear, unequivocal, and convincing" evidence either (1) that facts were suppressed which, if known, would have warranted denial of citizenship or (2) that their disclosure might have been useful in an investigation possibly leading to the discovery of other facts warranting denial of citizenship.

*Id.* at 355, 81 S.Ct. at 150–51.

The Court in *Chaunt* thereby devised a two-pronged test for materiality in denaturalization cases. Under the first prong, the Government must prove that a truthful answer to a question "would have warranted denial" of the application. In the alter-

---

**8.** It is worth noting that the statute on its face does not require a "material" misrepresentation to render an applicant ineligible. In *Fedorenko v. United States*, 449 U.S. 490, 507, 101 S.Ct. 737, 748, 66 L.Ed.2d 686 (1981), the Court interpreted the statute to include a materiality requirement. The Court analogized the DPA to the denaturalization statute, 8 U.S.C. § 1451(a) (1982), which authorizes denaturalization for "concealment of a material fact or ... willful misrepresentation." In *Fedorenko,* the Court attached the materiality standard to the DPA even though there was no mention of it in the statute. The DPA was amended in 1952 to exclude any alien who seeks to procure a visa "by willfully misrepresenting a material fact." Immigration and Nationality Act of 1952, § 212(a)(19),

Pub.L. No. 82–414, 66 Stat. 163, 183 (codified at 8 U.S.C. § 1182(a)(19) (1982)). The amendment is based on the belief that misrepresentations having no bearing on the material issues involved should not serve as a basis for exclusion. H.R.Rep. No. 1365, 82d Cong., 2d Sess., *reprinted in* 1952 U.S.Code Cong. & Ad.News 1653, 1704.

**9.** The Court, however, stated: "Had that disclosure not been made in the application, failure to report the arrests would have had greater significance. It could then be forcefully argued that failure to disclose the arrests was part and parcel of a project to conceal a Communist Party affiliation." 364 U.S. at 355, 81 S.Ct. at 150.

native, the Government may prevail under the second prong. The second prong deals with a situation in which the truthful answer to a question would not by itself warrant the disqualification of the applicant. The Government may still demonstrate that the misrepresentation is material if it shows that the truthful answer "might have been useful" in an investigation of the applicant "possibly leading to the discovery of other facts warranting denial of citizenship." *Chaunt*, 364 U.S. at 355, 81 S.Ct. at 151.

In *United States v. Fedorenko*, 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981), the Supreme Court affirmed the court of appeals' decision ordering Fedorenko's denaturalization. Without deciding the question of whether the *Chaunt* materiality test also governed false statements in visa applications, the Court reasoned: "At the very least, a misrepresentation must be considered material if disclosure of the true facts would have made the applicant ineligible for a visa." *Id.* at 509, 101 S.Ct. at 749.

In *United States v. Koziy*, 728 F.2d 1314 (11th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 130, 83 L.Ed.2d 70 (1984), the district court found that Koziy had failed to reveal in his visa application that he had been a member of the Ukrainian police. In affirming the revocation of Koziy's citizenship, the court of appeals stated:

> The district court found that Koziy never disclosed his membership in the Ukrainian Police Force. It ruled that if he had disclosed his connection with the police force in his visa application, his application would have been rejected outright.... These findings are not clearly erroneous.

*Id.*, 105 S.Ct. at 1320.

## B.

Had Kowalchuk revealed the facts which he suppressed on December 29, 1949, the day he obtained his visa, those facts would have warranted the denial of his visa and thereby precluded him from obtaining citizenship. As previously noted, the defendant willfully concealed his voluntary membership and employment in the Ukrainian militia/police force, his residence at Lubomyl, his attendance at the special training school during the German occupation, and his voluntary flight to Czechoslovakia with the retreating German military forces. *See* footnote 6 *supra*. As Michael R. Thomas, chief eligibility officer for the IRO, testified, *supra*, at 494, the DPC would accept only those refugees who were eligible for IRO assistance, and that an applicant who had voluntarily assisted the enemy force would be ineligible.[10] An applicant who reported that he belonged to a police force or militia (regardless of his function in the organization) would have been presumed to have voluntarily assisted the enemy. The applicant had the burden of proving eligibility for IRO assistance and his CM/1 form became the basic document upon which the field officer depended.

Conan, the DPC's senior reviewing officer of proposed reject applications for entry into the United States, also testified, *supra*, at 494. He stated that an applicant who reported that he had served in the Ukrainian schutzmannschaft would have been rejected unless he were able to prove that he served involuntarily and that he was not involved in persecution of civilians. This testimony is fully consistent with the *IRO Manual for Eligibility Officers*. A schutzmannschaft member who was unable to overcome the presumption would have been rejected even though the Ukrainian schutzmannschaft was not on a list of inimical organizations. (A 1512–13) Government exhibits demonstrate that applications in fact had been rejected in 1952 by

---

10. George L. Warren, former deputy senior officer for the United States Displaced Persons Commission in Salzburg, personally certified Kowalchuk's eligibility certificate. Warren testified that he would not have signed the certificate had he been aware that Kowalchuk was alleged to have been a member of a Ukrainian police unit. If the unit were not on a list of ineligible organizations, he testified that he would have referred the application to Frankfurt for review and further investigation.

the DPC under section 13 [11] of the Act on the ground of such membership. Moreover, Conan testified that applications of members of the Ukrainian schutzmannschaft would have been rejected prior to the 1950 amendment of the DPA.

John Chapin, American vice-consul in 1948 in Salzburg, Austria, testified that the IRO documents, the attested fragebogen, and the DPC's investigation and report accompanied the application for a visa. The standard procedure in every case was for the American vice-consul to read the fragebogen, personally interview the applicant concerning wartime residence and occupation, and to have the applicant swear to the truth of all the statements in the application, including the fragebogen. (A 1032–33) Close attention was paid to the applicant's occupation and residence during the war years and the applicant had the burden under the law of proving eligibility for a visa. Persons who had served in the Ukrainian police or militia would have been ineligible.

Whatever the defendant's motivation,[12] the misrepresentations and concealment were material to the IRO's determination in 1947 of whether Kowalchuk was a bona fide refugee and "of concern" to the IRO. They were plainly material to the vice consul's determination in 1948 that Kowalchuk was eligible for admission to the United States as a permanent resident. The evidence of willful misrepresentation, concealment, and materiality is clear, convincing, and unequivocal. Regardless of whether the defendant personally participated in the atrocities and brutalities committed by the Lubomyl schutzmannschaft, the district court found that the "defendant was aware of the responsibilities assigned to the schutzmannschaft, and occupied a responsible position, albeit largely clerical, within

that organization." 571 F.Supp. at 81. Truthful answers on the CM/1 and the fragebogen would have prevented the defendant from obtaining a visa under the DPA.

Because we conclude that disclosure of the true facts concerning defendant's wartime activities would have made him ineligible for a visa, we find it unnecessary to resolve the question of whether defendant's misrepresentations were material under the second prong of the *Chaunt* test. *See Fedorenko v. United States*, 449 U.S. at 509, 101 S.Ct. at 748.

## VI.

■ The defendant also contends that he was denied due process. He asserts that when his counsel was in the Soviet Union for the depositions of the government witnesses, the Soviet Union denied him the opportunity to visit Lubomyl to investigate or interview potential witnesses. However, as the district court observed, Soviet Russia also imposed the same limitations upon Government counsel. The defendant does not make any claim that he was deprived of any specific evidence or testimony. He makes no showing that any testimony has been excluded that "would have been material and favorable to his defense." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982).

At one point, defense counsel informed the Government that he knew of eighteen witnesses in the Soviet Union whom he would like to call. Yet, he made no request to interview any of them or to depose them. On the other hand, the Government by letter dated March 12, 1980 informed defense counsel that it was requesting permission from the Soviet Union to bring the deposed witnesses to the United States to testify and offered "to make a similar re-

---

**11.** Section 13 of the DPA provides: "No visa shall be issued under the provisions of the Act to any person who is or has been a member of, or participated in, any movement which is or has been hostile to the United States...." This section provides another independent ground for ineligibility for a visa in this case and was the subject of the Government's amended complaint.

**12.** The defendant testified that he made the misrepresentations of residence to the IRO to prevent possible retaliation by the Soviets against his parents. However, his brother, Mykola, previously had stated truthfully his residence in Lubomyl to the IRO and the defendant knew this.

quest on behalf of the Kowalchuks that specific witnesses be produced to testify on their behalf." The defense failed to follow through on the Government's offer. Their request to interview witnesses was made only after defense counsel was in the Soviet Union and even then it was made informally. Moreover, the trial court's factual conclusions are based upon the testimony of the defendant and his witnesses or other evidence not inconsistent with that testimony. 571 F.Supp. at 80.

We see no merit to the defendant's due process contention.

### VII.

In sum, the district court revoked the defendant's citizenship on the following independent grounds: (1) the defendant was not a genuine refugee "of concern" to the IRO and therefore was not entitled to the benefits of the Displaced Persons Act because (a) as a member of the schutzmannschaft he voluntarily assisted the enemy forces in their operations against the United Nations, and (b) in such capacity he assisted the Nazis in persecuting civilians, and (2) the defendant illegally obtained his visa because he made willful material misrepresentations to gain admission to the United States as a permanent resident.

Although we do not decide whether the record supports the district court's conclusion that the defendant assisted the enemy in persecuting civilians, we hold that the record fully supports the trial judge's findings and his conclusions concerning the defendant's voluntary assistance to enemy forces and his willful material misrepresentations.

Accordingly the judgment of the district court will be affirmed.

ALDISERT, Chief Judge, with whom WEIS, Circuit Judge, joins, and with whom Hunter and Mansmann, Circuit Judges join in parts V–IX, dissenting.

Should this court strip American citizenship away from Serge Kowalchuk, a member of a known Ukrainian anti-Communist family, and possibly deport him to the Soviet Union based on a denaturalization proceeding initiated by information that first appeared in the Soviet newspaper, *Trud*, the official organ of the notorious state security police, the KGB? That is the overarching question implicated in this appeal. My answer resounds in the negative. Accordingly, I dissent.

### I.

Appellant was born in Kremianec in the Ukraine in 1920, and later moved to Lubomyl, also in the Ukraine. Shortly after the invasion of Russia in 1941, the Nazis overran Lubomyl and took control of the local government. During the period of Nazi occupation, appellant worked as a clerk for the Lubomyl police (also known as the schutzmannschaft or militia) and did food distribution work. As a police clerk he occasionally wore a uniform, was aware of the restrictions placed on Lubomyl Jewish residents, and typed duty rosters which assigned the other militia men to patrol the Lubomyl Jewish ghetto. As in other areas under Nazi occupation, the Lubomyl Jews were subject to persecution, abuse, degradation, and eventually massive extermination. At the time when the Jewish population in Lubomyl was exterminated, however, appellant was not in the village; he was receiving special training at German expense at a school in another town. Moreover, I am impressed that no evidence establishes that appellant performed any militia patrol duties himself or that he was engaged directly in persecuting the Jewish people.

In 1944, appellant moved west. His family's ardent anti-Communist feelings were generally well known. Obviously he did not wish to remain or return to Lubomyl, then under Soviet control. He fled the advancing Russian armies,[1] and eventually entered a displaced persons' camp in Aus-

---

1. The majority allege that, as the Russian army approached Lubomyl, appellant and his family

tria. To determine whether the International Relief Organization of the United Nations (IRO) could classify him as either a refugee or displaced person, Kowalchuk filed a form CM/1. On this form, he stated that during the war he lived in Kremianec, not Lubomyl, and that he worked as a tailor, not for the Lubomyl militia. This, of course, was not true. He later explained that he lied on his CM/1 form because he was fearful of Soviet reprisals against his family, because of his antipathy to the Communists, and because he did not wish to be returned to the Soviet Union. He did not know precisely where all members of his family were located and he knew the Soviet Mission would have access to the information on the CM/1 form. Kowalchuk's misrepresentations as to his residence and employment during the war, set forth on the CM/1 form, were transcribed or appended onto his United States visa application. He was granted a visa in 1949.

In its rendition of the facts, the majority attempt to paint a much harsher picture both of the Lubomyl militia in general and appellant's wartime activities in particular. I quickly recognize that it is always difficult to reconstruct what actually happened at any point in history, and more difficult still when the events of consequence occurred during totally devastating wartime conditions, in enemy territory, over forty years ago. Indeed, this realization lies at the core of the due process issues which I will soon discuss. The task is further complicated here because, as noted by the district court, "unlike virtually every other reported denaturalization case, there is in this case not one scrap of documentary evidence relating to the pertinent events." *Kowalchuk*, 571 F.Supp. at 75. In all

cases, an appellate court should adhere closely to the district court's properly found facts based on that court's determinations of witness credibility; under these special conditions, this requirement assumes a fortiori proportions.

What must be emphasized is that our concern here is with evidence found credible by the fact finder below, not with testimony offered. Our concern here is with Kowalchuk's personal conduct, not the general conditions in war-torn Lubomyl, as horrible as they no doubt were. Our concern here is his role in the Lubomyl militia, and the effect of that role on his grant of a visa.

### II.

Kowalchuk raises two arguments in his appeal from the district court's judgment that ordered denaturalization: (1) that the district court's legal conclusions that he violated the Displaced Persons' Act (a) "voluntarily assisted the enemy forces," (b) "assisted the enemy in persecuting civil populations," and (c) wilfully made misrepresentations in his visa application; and (2) that his due process rights were violated because present Soviet control of the area where the alleged conduct took place essentially prevented him from presenting an effective defense.

Thus, the statutory question presented for disposition is whether in applying 8 U.S.C. § 1451(a), the district court erred in revoking Kowalchuk's naturalization on three grounds: (1) that as a member of the Lubomyl militia he voluntarily assisted the enemy; (2) that as a member of the Lubomyl militia he assisted the Nazis in persecuting civilian populations; and (3) that he made a willful, material misrepresentation

"departed voluntarily," at 491 n. 5, and that he concealed his "voluntary departure with the retreating German military forces." *Id.* at 492. The district court found this evidence equivocal at best, stating:

> If the defendant's activities [in the Lubomyl militia] had been as innocuous as he claims, there would have been little reason for him to leave Lubomyl with the retreating Germans. It must be admitted, however, that this argu-

ment is considerably weakened by the fact that the defendant's parents, at least, had valid reasons for leaving at that time, and it would be quite understandable that the family would wish to remain together. Moreover, flight from the advancing Russian army was a widely prevalent mode of behavior.

*United States v. Kowalchuk,* 571 F.Supp. 72, 76 (E.D.Pa.1983).

of fact by lying about his wartime residence and employment. *See United States v. Kowalchuk*, 571 F.Supp. 72, 82–83 (E.D. Pa.1983). But Kowalchuk's due process claim, deemed so insignificant by the majority that they summarily dismissed it, *see* page 498–499, is to me so important an issue that I choose to address it first.

### III.

Before analyzing the specific legal questions, I must describe conditions in Europe and in the displaced persons camps at the time Kowalchuk applied for the visa application. I start with V–E Day, May 8, 1945. Notwithstanding the presence of European nation-states, the power to rearrange the map of Europe had passed to the United States and the Soviet Union. The Hitlerian Reich had come to an end. At its peak the Nazi empire stretched from the French port of Brest to the Caucasus and from the tip of Norway to the border of Egypt. In the six-year struggle to bring down that empire, an estimated 40 million Europeans lost their lives—in combat, under the bombs that obliterated cities, through Hitler's methodical genocide, or simply from hunger, cold and disease.

In Germany, the state had ceased to exist. A mass of civilians, freed prisoners and the first waves of 13 million refugees from Eastern Europe wandered the country. Nearly 8 million Germans were homeless. It was a time when people bartered household necessities for food and clothing and often subsisted on little more than 1,000 calories a day.

The onset of a chill between the Soviets and Western allies sealed the division of the country between two hostile occupation zones. By 1947 it was becoming clear that Stalin had no intention of fulfilling his promise to Roosevelt and Churchill at Yalta to hold free elections in Poland. Where the Red Army stood, Soviet power reigned and probed westward. A Communist insurgency, supported from bases in Bulgaria, Albania and Yugoslavia, threatened the vulnerable British-backed monarchy in Greece. Soviet pressure mounted against Turkey for control of the Black Sea straits.[2]

Such were the political clouds that hovered over the displaced persons' camp when Kowalchuk applied for his visa. Refugees in Central Europe's camps were pawns in a vicious political struggle acted out by the two superpowers in the late forties in central Europe. The die having been cast in both the west and in the east by the occupying armies, Central Europe remained the primary political battleground for almost a decade after V–E Day. American and Soviet diplomatic armies postured eyeball-to-eyeball. The *de facto* division of Germany had already taken place but the Berlin airlift, and the Berlin wall were yet to come. Austria, the precise location of Kowalchuk's visa application, was still a pawn between the West and the East, and was yet to be the subject of the later checkmate which conferred upon that country an unallied, neutral status.

As the saying goes, the rest is history. The cold war has continued between the United States and the Soviets for over 40 years with charge and countercharge. The Soviets have continued to make use of its state security police, the KGB, within and without the Soviet Union; its espionage operations making devastating infiltrations within the United States in 1985 in the U.S. Navy and the Federal Bureau of Investigation. For reasons that I refuse to regard as completely altruistic, the Soviet KGB has singled out American citizen Serge Kowalchuk for immediate attention by our government, in a stream of extravagant accusations subsequently not proved in the district court. Should these denaturalization proceedings be successful, however, and subsequent deportation to the Soviet Union be effected (ostensibly to the Ukraine), I am certain that the KGB will have a welcoming committee awaiting the return of a member of a family that dared defy Communist dogma in the Ukraine in the early forties. With such a background, it is understandable why the Soviet authori-

2. *See* Special Report, Forty Years After V–E Day, Time Magazine 16–23 April 29, 1985.

ties denied Kowalchuk the opportunity to conduct even a primitive preparation of a defense. With such a background it should come as no surprise that this Soviet conduct denied Kowalchuk the most basic of due process rights.

## IV.

Although I recognize that we would normally not address the constitutional issue if an independent statutory ground supports the outcome, I feel that under these particular circumstances the constitutional violation is so compelling that it requires discussion first. Our Department of Justice required Serge Kowalchuk to defend himself against charges based on events that occurred over forty years ago in the Soviet Union. John Rogers Carroll, an experienced Philadelphia trial lawyer, represented him, but was not able to obtain, interview, or even seek witnesses in the Soviet Union. Attorney Carroll was permitted to travel to the Soviet Union, but, incredibly, was allowed to interview only those witnesses obtained and controlled by the Soviet government. Mr. Carroll, Kowalchuk's attorney, was also not permitted to visit Lubomyl, for the purpose of either obtaining witnesses or collecting physical evidence; incredibly he was denied access to the very town where the government claims the illegal conduct of Kowalchuk took place. App. at 1689. The Soviets sowed the seeds of these proceedings by blasting away accusations against Kowalchuk in Trud, the house organ of the KGB.

When this American citizen, Kowalchuk, attempted to prepare a defense to these Soviet-instigated charges, he found the Soviet fox to be the keeper of the chicken house. Kowalchuk's contention, therefore, goes far beyond an argument that he was denied the opportunity to interview potential witnesses. Rather, it is that he was denied the opportunity to develop a meaningful defense of any type.[3] Because I believe that the right to present witnesses and establish a defense is a fundamental element of due process of law, I also believe that revocation of Serge Kowalchuk's citizenship, under the circumstances here, constitutes a blatant violation of a very precious fundamental right.

### A.

In *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), the Supreme Court observed:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose

---

**3.** As Mr. Carroll stated in the district court: What we have [are] handouts of the NKVD [the KGB]. That is all that the Government has. That is all that the Russians will give. Our complaint due process-wise doesn't say that we are being deprived of specific witnesses. It says a lot more. It says ... we couldn't name these people because of our fears of what would happen to them.

The situation is backed up by the testimony of Professor Bilinsky who testifies as an expert, Your Honor—and there is no contradiction or quarrel about this—that what would happen to those people if we went and tried to use them as witnesses would be unspeakable. Their lives would be made miserable if they were to try to help somebody who, a year ago this week, they described me as the advocate of the Nazi murderer Kowalchuk in their papers somewhat ahead of adjudication.

But, if your Honor please, that betokens the attitude that we are faced with and the utter futility of attempting—they told us when we went there that Lubomyl is a closed town. That means foreigners are not allowed. It means really that arbitrarily the Russian government is saying, "You can't go in there even if you wanted to."

I tried to reconstruct a map of Lubomyl which Mykola Kowalchuk described to Your Honor as having an elevation which made it impossible for some of the witnesses—particularly these Israeli witnesses whose vantage point were pinned down in their testimony—to see what they claimed they say. I couldn't even verify that by a visit to Lubomyl much less could we make any inquiry.

App. at 1654–55.

of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law. *Id.* at 19, 87 S.Ct. at 1923.[4]

Numerous other cases have established the contours of the right to present witnesses and to establish a defense. For example, the Court has held that a judge's stern warning of the consequences of perjury to a defense witness, which caused the witness not to take the stand, deprived the defendant of his due process right to offer the testimony of witnesses. *Webb v. Texas,* 409 U.S. 95, 98, 93 S.Ct. 351, 353, 34 L.Ed.2d 330 (1972). Likewise, we have held that the removal of exculpatory evidence by police "den[ies] a defendant an opportunity to present competent proof in his defense [and] constitutes a violation ... of due process." *Henderson v. Fisher,* 631 F.2d 1115, 1119 (3d Cir.1980).

Although the *Washington* doctrine was enunciated in the context of a criminal case, denaturalization cases are akin to criminal proceedings, especially in the burden of proof placed on the government. *See Fedorenko v. United States,* 449 U.S. 490, 505, 101 S.Ct. 737, 746, 66 L.Ed.2d 686 (1981); *Costello v. United States,* 365 U.S. 265, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961). "American citizenship is a precious right. Severe consequences may attend its loss, aggravated when the person has enjoyed his citizenship for many years." *Costello v. United States,* 365 U.S. 265, 269, 81 S.Ct. 534, 536, 5 L.Ed.2d 551 (1961). In *Klapprott v. United States,* 335 U.S. 601, 69 S.Ct. 384, 93 L.Ed. 266, *modified,* 336 U.S. 942, 69 S.Ct. 384, 93 L.Ed. 1099 (1949), in an opinion announcing the judgment of the Court, and in which three other justices were at least in substantial accord, Justice Black stated:

Denaturalization consequences may be more grave than consequences that flow from conviction for crimes.... This court has long recognized the plain fact that to deprive a person of his American citizenship is an extraordinarily severe penalty. The consequences of such a deprivation may even rest heavily upon his children.... As a result of the denaturalization here, petitioner has been ordered deported. "To deport one who so claims to be a citizen, obviously deprives him of liberty.... It may result also in loss of both property and life; or of all that makes life worth living." *Ng Fung Ho v. White,* 259 U.S. 276, 284 [42 S.Ct. 492, 495, 66 L.Ed. 938 (1922)]. Because denaturalization proceedings have not fallen within the technical classification of crimes is hardly a satisfactory reason for allowing denaturalization without proof while requiring proof to support a mere money fine or a short imprisonment.

Furthermore, because of the grave consequences incident to denaturalization proceedings we have held that a burden rests on the Government to prove its charges in such cases by clear, unequivocal and convincing evidence which does not leave the issue in doubt. *Schneiderman v. United States,* 320 U.S. 118, 158 [63 S.Ct. 1333, 1352, 87 L.Ed. 1796]. This burden is substantially identical with that required in criminal cases— proof beyond a reasonable doubt.

*Id.* at 611–12, 69 S.Ct. at 389. The fragmented nature of the *Klapprott* decision

---

**4.** In explaining why this "right is a fundamental element," Chief Justice Earl Warren, speaking for the Court, explained:

Joseph Story, in his famous Commentaries on the Constitution of the United States, observed that the right to compulsory process was included in the Bill of Rights in reaction to the notorious common-law rule that in cases of treason or felony the accused was not allowed to introduce witnesses in his defense at all. Although the absolute prohibition of witnesses for the defense had been abolished in England by statute before 1787, the Framers of the Constitution felt it necessary specifically to provide that defendants in criminal cases should be provided the means of obtaining witnesses so that their own evidence, as well as the prosecution's, might be evaluated by the jury.

*Washington,* 388 U.S. at 19–20, 87 S.Ct. at 1923, citing 3 Story, Commentaries on the Constitution of the United States §§ 1786–88 (1st ed. 1833).

offers no solace to the government here because in *United States v. Riela,* 337 F.2d 986, 988 (3d Cir.1964), this court adopted Justice Black's reasoning. It cannot be seriously challenged that due process guidelines applicable in a criminal context must also guide our decision here.

### B.

Several important factors underscore the severity of the due process violation involved here:

1) the origination of the charges in a KGB-controlled publication;

2) the inability of Kowalchuk to ascertain, locate or even interview favorable witnesses in Lubomyl;

3) the unlikelihood of obtaining reliable testimony from the Soviet witnesses.

The KGB's unique role in the Soviet system as the guard dog of the political power structure is well known.[5] In the twenties and thirties, the KGB was the principal weapon of Stalin's cruel rural collectivization campaign, which Stalin later admitted claimed ten million victims. Stalin also used the organization with ruthless effectiveness in crushing political opposition in the purges of the thirties and forties. Aleksander I. Solzhenitsyn's masterpiece, *The Gulag Archipelago* vividly chronicles the brutal role this organization performed during that period. See also R. Medvedev, *Let History Judge* (Knopf, New York 1971), Chapter VII, "Illegal Methods of Investigation and Confinement" for a Soviet-published account of the brutal methods employed by the KGB. The Ukraine, because of its resistance to the Communists, bore the brunt of these campaigns. After World War II, the terror continued: "A particular area of secret police concern was the resurgent nationalism among the minority nationality groups of the Soviet Union. In the Ukraine, Byelorussia, and elsewhere, the war years, despite the tragic experiences of the German occupation, had brought an opportunity to express national consciousness to a degree not permitted under Soviet rule.... The secret police assumed the task of ... combatting expressions of nationalism in intellectual life." S. Wolin & R. Slusser, *supra,* at 23. *See also* A. Romanov, *Nights are Longest There, A Memoir of the Soviet Security Services* 116–17 (Little, Brown & Co., Boston 1972).

Also, the KGB's operations range far beyond Soviet borders; the KGB routinely operates throughout the world conducting intelligence operations, inciting revolutionary activities, and acting as the Party's enforcement agency. *See* J. Barron, *KGB, The Secret Work of Soviet Secret Agents* 1–28 (Readers Digest Press, New York 1974) (hereinafter cited as *KGB*). For example, "[a]pproximately 400 officers of the KGB and its military subsidiary, the GRU, are permanently stationed in New York, Washington and San Francisco, to spy and conduct Active Measures. Their labors are abetted by hundreds more officers of the Cuban, Bulgarian, East German, Polish, Czechoslovakian, and Hungarian intelligence services, which function as KGB auxiliaries." J. Barron, *KGB Today: The Hidden Hand* 195 (Readers Digest Press, New York 1983). Frequently, the KGB's continuing campaign against Ukrainian nationalists has reached beyond the Soviet borders, with lethal effect. *See KGB, supra,* at 311–16. Therefore, the KGB's involvement and assistance in the origination and the subsequent prosecution of these

---

5. "KGB" is the acronym for the Komitet Gosudarstvennoy Bezopasnosti, or translated, the Committee for State Security. Since its inception on December 20, 1917, as the Cheka, the organization has been known as the GPU, OGPU, GUGB, NKVD, NKGB, and the MGB. The original Soviet constitution vested the KGB's predecesor with the broad duty "to unite the revolutionary efforts of the Union Republics in the struggle against political and economic counterrevolution, espionage and banditism."

This broad duty was accompanied by equally broad powers; because the organization's leaders took their orders directly from the Communist Party leadership, they were essentially beyond restriction by any other Soviet laws. Thus, "whoever controlled the central Party organization had in the secret police an investigative and punitive arm of tremendous scope and power." S. Wolin & R. Slusser, *The Soviet Secret Police* (Greenwood Press, Westport, Conn. 1957).

charges makes their authenticity highly suspect.

Additionally, at his trial, Kowalchuk presented the testimony of Nina S. Koranvaska, Ph.D., Simas Kudirka, and Professor Yaroslav Bilinsky to support his claim that because of the political and legal system of the U.S.S.R., he was not able to obtain, interview, or even seek witnesses in his favor in the Soviet Union. The testimony of Koranvaska and the other defense witnesses established that the Soviet government has used accusations of war crimes as a means of embarrassing and harassing Ukrainian emigres whom they view as anti-Communist or as advocates of Ukrainian nationalism. Professor Bilinsky, a Polish immigrant and expert on Soviet and Eastern European Studies, testified in his deposition that: "[T]he Soviet government, including the Soviet Ukrainian government, wants to discredit the Ukrainian emigres. They want to discredit them in the eyes of the other Soviet Ukrainians. They want to discredit them in the eyes of American citizens, and they want to discredit them in the eyes of the American Government." App. at 1386.[6] Professor Raul Hilberg, one of the Government witnesses, acknowledged that Soviet authorities tightly control all access to all documents concerning World War II war crimes. Id. at 827–30. Additionally, testimony of the defense witnesses established that Soviet authorities routinely manipulate witnesses, especially in political trials, and that any efforts by defendant to obtain favorable evidence from Soviet citizens would endanger those citizens' safety. Id. at 1401.

Other courts have expressed hesitancy in crediting evidence from Soviet sources. In United States v. Kungys, 571 F.Supp. 1104 (D.N.J.1983), a case involving facts that are quite similar to those of this appeal, the court emphasized the Soviet's motivation for discrediting emigres:

> Despite Soviet conquest [of Lithuania] there remain strong nationalistic feelings and continuing allegiance by a significant portion of the population to the Roman Catholic Church. The attempts by Soviet authorities to stamp out these influences and to create the myth of historic friendship between the people of the Soviet Union and its various national groups are weakened by the presence abroad of large groups of emigres who experienced personally the effects of Soviet occupation and who help keep alive Lithuanian national and religious convictions.
>
> . . . .
>
> In 1964 there was formed the Latvian Committee for Cultural Relations of Latvians abroad, and during 1970–76 Lesinskis [a Latvian member of the KGB who defected in 1978] was chairman of its presidium, receiving instructions from the KGB. Its objective was also to discredit Latvian emigres, particularly those who actively sought the end of the Soviet occupation. This was accomplished by publication of books and articles purporting to describe the war crimes and collaboration of which emigres were guilty.

---

**6.** See also the testimony of Nina Koranvaska, a Ukrainian immigrant and doctor of microbiology, who now works for the Ukrainian World Congress for Freedom of Human Rights, and testified at trial as follows:

Q  What is the interest of the Soviet Government in Ukrainian immigrants?
A  Very great.
Q  What is the nature of that? How does the Soviet Government look upon a Ukrainian immigrant?

. . . .

THE WITNESS: [The] Ukraine is occupied factually by the Soviet Union and the immigrant beyond the borders, beyond the Soviet Union are the only representatives that spread the truth about Ukrainian position there.

> Only lately did the Ukrainian immigrants begin to tell the story about Ukraine in Soviet Union. Therefore, the Soviet Union is interested to destroy the political image of Ukrainian immigrants outside of its borders.
> BY MR. CARROLL:
> Q  Is it in the interest of the Soviet Government to portray Ukrainian immigrants as anti-Semitic?
> A  There is no question about it, since the Soviet Government even in the Ukraine has a policy of anti-Semitism in its country. So therefore they continue the same policy which concerns the immigrants outside of the borders of Soviet Union.
> App. at 1352–53.

The facts were often embellished and supplemented with forged documents, false testimony and pure invention. When he was assigned to a post in the United States, Lesinskis' job was to obtain information about Latvian communities abroad, to promote discord within them and to discredit their leaders. All of this was a KGB function.

*Id.* at 1124. The court concluded that

We are faced with a situation where the Soviet Union has a continuing, strong state interest in a finding that defendant was guilty of atrocious conduct while collaborating with German occupation forces. We also are faced with the fact that the Soviet Union uses special procedures in political cases such as this which, on occasion at least, result in false or distorted evidence in order to achieve the result which the state interest requires.

*Id.* at 1126.

In *Kungys* the district court found the government's evidence not credible and denied the government's petition to revoke Kungys's citizenship. The court rebuked the government for its use of Soviet supplied evidence:

The government elected to collaborate in the prosecution of this case with the Soviet Union, a totalitarian state. It has accepted the assistance of Soviet authorities, particularly the testimony of witnesses who had been interrogated by Soviet investigators and from whom statements had been obtained by those interrogators.

Knowing the nature of the Soviet legal system, the government had an obligation to make every effort to ensure that the testimony it received under the auspices of the Soviet authorities was not tainted by the known Soviet practices designed to obtain the desired results in a particular case even at the expense of the truth. If the government deputizes a totalitarian state to obtain for it evidence to be used in a United States court, the government must take whatever steps are necessary to ensure that the evidence was not coerced or otherwise tainted by improper pressures.

*Id.* at 1131–32. *See also United States v. Sprogis,* 763 F.2d 115, 120–21 (2d Cir.1985); *Laipenieks v. I.N.S.,* 750 F.2d 1427, 1435–36 (9th Cir.1985).

Congruent with the Supreme Court's teaching in *Washington,* I conclude that a significant deprivation of due process occurred because the Soviet authorities controlled both the witnesses supplied to the government and Kowalchuk's access to any possible exculpatory information.

C.

The majority rely upon *United States v. Valenzuela-Bernal,* 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982), to support its summary dismissal of Kowalchuk's due process argument. That case is easily distinguished. In *Valenzuela-Bernal,* the defendant drove a car with five illegal aliens through a border patrol check-point. The defendant and three passengers were apprehended, but two of the passengers were deported after they identified the defendant as the driver of the car and admitted they were illegally in the country. One passenger, Romero-Morales, was detained as a witness. Subsequently, the defendant was charged with, and convicted of, transporting an illegal alien, namely Romero-Morales.

The defendant argued that deportation of the other passengers had violated his sixth amendment right because "the deportation had deprived him of the opportunity to interview the two remaining passengers to determine whether they could aid in his defense." *Id.* at 861, 102 S.Ct. at 3443. The Court found this argument invalid absent some showing of materiality: "Sanctions may be imposed on the Government for deporting witnesses only if the criminal defendant makes a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." *Id.* at 873, 102 S.Ct. at 3449.

For Kowalchuk the deprivation of due process goes far beyond the scope of that suffered in *Valenzuela-Bernal*. The *Valenzuela-Bernal* Court noted:

> [R]espondent was present throughout the commission of this crime. No one knows better than he what the deported witnesses actually said to him, or in his presence, that might bear upon whether he knew that Romero-Morales was an illegal alien who had entered the country within the past three years.... Romero Morales, of course, remained fully available for examination by the defendant and his attorney.

*Id.* at 871, 102 S.Ct. at 3448. Kowalchuk's attorney was not only denied convenient access to witnesses, he was essentially denied the ability to present any defense at all. Unlike Valenzuela-Bernal, Kowalchuk was denied access to the location of the alleged disqualifying acts themselves, Lubomyl, to refute the testimony of hostile witnesses based on the physical location of the events. Although Kowalchuk was denied completely the ability to obtain, interview, or even seek favorable witnesses, Valenzuela-Bernal was merely denied convenient access to two known witnesses. Finally, Kowalchuk had to defend himself while looking across a 40 year gulf of time, a factor not present in *Valenzuela-Bernal*. The deprivation suffered by Kowalchuk, therefore, far exceeds that of *Valenzuela-Bernal*, and makes that case inapposite.

The district court's treatment of Kowalchuk's due process claim was totally inadequate. The district court ignored Kowalchuk's right to investigate and obtain witnesses, compensating by discarding the testimony of those Soviet witnesses produced by the government who did testify:

> For the most part, therefore, the factual conclusions which follow are based upon the testimony of the defendant and his witnesses, or other evidence not inconsistent with that testimony.

571 F.Supp. 72, 80. Purportedly ignoring the Soviet witnesses in no way corrects Kowalchuk's inability to present a defense. The essential inquiry is whether Kowalchuk had an ample and fair opportunity to seek, interview and present favorable evidence. The undeniable response to this inquiry is that he did not.

It is no answer to say that the government was also restricted in its ability to obtain evidence other than that spoon fed to it by the Soviet authorities. I have the strong feeling that had the United States been given the opportunity to thoroughly investigate this case, it might well have decided not to prosecute. As it was, the government's case is based on evidence produced by the KGB to effectuate its political ends. Congruence between that purpose and individual justice has yet to be established. The net result is that the prosecution is in the uncomfortable position of arguing allegations which it has not had the opportunity to verify and which it, in all good conscience, must view as suspect.

I now turn to Kowalchuk's statutory contentions.

## V.

Denaturalization proceedings operate with two competing interests at stake. On the one hand, a certificate of citizenship is "an instrument granting political privileges, and open like other public grants to be revoked if and when it shall be found to have been unlawfully or fraudulently procured." *Johannessen v. United States*, 225 U.S. 227, 238, 32 S.Ct. 613, 615, 56 L.Ed. 1066 (1923). On the other hand, because American citizenship once obtained is an inestimable right, the government must meet one of the highest burdens of proof in modern jurisprudence; to set aside a grant of citizenship the government's evidence must be clear, unequivocal and convincing and not leave the issue in doubt. *Fedorenko v. United States*, 449 U.S. 490, 505, 101 S.Ct. 737, 746, 66 L.Ed.2d 686 (1981). Our standard of review of the historical or narrative facts, either basic or inferred (or sometimes called "subsidiary facts") is the familiar clearly erroneous rule. *Krasnov v. Dinan*, 465 F.2d 1298, 1302–03 (3d Cir. 1972).

Yet basic and inferred facts "must be distinguished from a concept described in a term of art as an 'ultimate fact.'" *Universal Minerals Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 102 (3d Cir.1981). An ultimate fact is a determination made by a trial court upon which liability turns. It may either be "a conclusion of law or at least a determination of a mixed question of law and fact." *Helvering v. Tex-Penn Oil Co.,* 300 U.S. 481, 491, 57 S.Ct. 569, 574, 81 L.Ed. 755 (1937); *see also Pullman-Standard v. Swint,* 456 U.S. 273, 286 n. 16, 102 S.Ct. 1781, 1789, n. 16, 72 L.Ed.2d 66 (1982). The factual components of the "ultimate fact" are subject to review under the clearly erroneous rule. *Pullman-Standard v. Swint,* 456 U.S. at 286–87 n. 16, 102 S.Ct. at 1789 n. 16; *Cuyler v. Sullivan,* 446 U.S. 335, 342, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980); *Neil v. Biggers,* 409 U.S. 188, 193 n. 3, 93 S.Ct. 375, 379 n. 3, 34 L.Ed.2d 401 (1972). The legal components of the "ultimate fact," however, are subject to plenary review for legal error. *Pullman-Standard v. Swint,* 456 U.S. at 286 n. 16, 102 S.Ct. at 1789 n. 16; *Cuyler v. Sullivan,* 446 U.S. at 341–42, 100 S.Ct. at 1714.

## VI.

The government sued to have appellant denaturalized under 8 U.S.C. § 1451(a). This statute provides that a grant of citizenship may be revoked if it was "illegally procured or ... procured by concealment of a material fact...." For a grant of citizenship to be procured legally, the applicant must have been in the country for at least five years after being lawfully admitted pursuant to a valid visa. 8 U.S.C. §§ 1181(a), 1427(a)(1). Appellant entered the United States under a visa issued pursuant to the Displaced Persons Act of 1948 (DPA), Pub.L. No. 774, 62 Stat. 1009 (1948), which was enacted by Congress to ease the then existing quota structure and allow for increased immigration of World War II displaced persons into the United States. If, therefore, a person either was not eligible for refugee or displaced person status under the DPA or made a material misrepre-

sentation on his visa application, he could be denaturalized under § 1451(a). *See Fedorenko v. United States,* 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981).

The DPA provided:

(b) "Displaced person" means any displaced person or refugee as defined in Annex I of the Constitution of the International Refugee Organization and who is the concern of the International Refugee Organization [IRO].

DPA § 2(b), 62 Stat. at 1009, Part II of the IRO Constitution defined persons who are not the concern of the organization:

*Persons who will not be the concern of the Organization.*

1. War criminals, quislings and tailors.

2. Any other persons who can be shown:

(a) to have assisted the enemy in persecuting civil populations of countries, Members of the United Nations; or

(b) to have voluntarily assisted the enemy forces since the outbreak of the second world war in their operations against the United Nations.[1]

---

[1] Mere continuance of normal and peaceful duties, not performed with the specific purpose of aiding the enemy against the Allies or against the civil population of territory in enemy occupation, shall not be considered to constitute "voluntary assistance." Nor shall acts of general humanity, such as care of wounded or dying be so considered except in cases where help of this nature given to enemy nationals could equally well have been given to Allied nationals and was purposely withheld from them.

[Footnote in the original.]

Constitution of International Refugee Organization, Annex I, Part II, *opened for signature* Dec. 15, 1946, 62 Stat. 3037, 3051–52, T.I.A.S. No. 1846. The DPA also provided that: "Any person who shall willfully make a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person shall thereafter not be admissible into the United States." DPA § 10, 62 Stat. at 1013.

**508**

### VII.

In our review, we must determine, as a matter of law, whether the government proved its case with clear, unequivocal and convincing evidence that did not leave the issue in doubt in regard to three issues: that Kowalchuk voluntarily assisted the enemy forces in their military operations; or assisted the enemy in persecuting civil populations; or made a willful misrepresentation in obtaining a visa.[7]

### A.

I consider first the district court's determination that appellant violated § 2(b) of Part II of the IRO Constitution in that he "voluntarily assisted the enemy forces." This is an ultimate finding, and is a mixed question of law and fact. I conclude that the narrative facts, upon which the legal conclusion rests, are supported by sufficient evidence in the record so that they are not clearly erroneous. *See Krasnov v. Dinan,* 465 F.2d at 1302–03. No party disputes that appellant did work for the Lubomyl militia and that this organization was a component of the Nazi-sanctioned local government. Further, I can draw the permissible inference that the militia provided at least some level of assistance to the enemy. But, to prove a violation of the statute and allow for denaturalization, the government had to meet its burden of proving that appellant's visa was illegal, or that appellant *voluntarily* assisted the enemy.

The district court found that "[i]t is not at all clear that, in 1949, membership in or employment by the schutzmannschaft at Lubomyl would have precluded the issuance of a visa," but somehow concluded that the government had nevertheless proved, with adequate certainty, that Kowalchuk's conduct constituted voluntary assistance. 571 F.Supp. at 82. The majority attempt an end run around this finding of fact. The majority somehow fashion an administrative presumption which operates to minimize drastically the government's heavy burden of proof—a burden established Supreme Court decisions, a burden that cannot be diminished by any administrative manual. Moreover, the majority's reliance is an intellectual frolic of their own, not shared by the district court here.

The majority assert that "[t]he provisions of the IRO constitution, and the testimony of Thomas, Conan, and Hilberg support the district court's findings and convincingly demonstrate that the defendant's voluntary membership in the Ukrainian schutzmannschaft constituted voluntary assistance to the enemy." At 494. As support for their position that membership in the Ukrainian militia would have led to either a presumption of voluntary assistance, or constituted grounds for *per se* ineligibility for a visa, the majority rely upon paragraphs 22 and 27 of Chapter VI of the *IRO Manual for Eligibility Officers* as placing the burden upon an applicant who is shown to have been a member of a local police force to "disprove the voluntary nature of his enlistment." *Id.* n. 7. By relying on this presumption, the majority permit the government to sidestep its heavy burden of proving voluntary assistance by clear and convincing evidence. No authority sanctions such glib reallocation of Supreme Court-imposed burdens of proof.

I am forced to emphasize that denaturalization procedures are akin to criminal procedures; the clear, unequivocal and convincing evidence burden "is substantially identical with that required in criminal cases—proof beyond a reasonable doubt.'" *United States v. Riela,* 337 F.2d 986, 988 (3d Cir.1964) (quoting *Klapprott v. United States,* 335 U.S. 601, 612, 69 S.Ct. 384, 389, 93 L.Ed. 266 (1949)). In other criminal contexts, the Supreme Court has determined that use of a presumption by the

---

7. The government asserts that § 13 of the DPA provides an independent ground for ineligibility for a visa in this case. Section 13 forbids issuance of a DPA visa to "any person who ... has been a member of ... any movement which is or has been hostile to the United States...."

Because the district court made no finding that the Ukrainian schutzmannschaft was a "movement ... hostile to the United States," I find the government's position unsupported by the record.

government violates due process. In *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), the Court held that use of a presumption to place upon the defendant the burden of disproving an essential element of the crime violated due process. *See also Sandstrom v. Montana*, 442 U.S. 510, 524, 99 S.Ct. 2450, 2459, 61 L.Ed.2d 39 (1979); *Patterson v. New York*, 432 U.S. 197, 215–16, 97 S.Ct. 2319, 2329–30, 53 L.Ed.2d 281 (1977). The implications for this appeal thus are unavoidable. In arriving at a contrary conclusion in this membership *per se* issue, the district court correctly ignored the presumption upon which the majority ground their case.[8]

### B.

Moreover, the IRO Constitution and the IRO manual are ambiguous with regard to whether Kowalchuk would have been considered to have voluntarily assisted the enemy based simply on his membership in the schutzmannschaft. The statutory language relating to § 2(b) of the IRO Constitution, incorporated into the DPA, defined what constituted "to have voluntarily assisted the enemy forces," by a specific explanatory footnote:

[1] Mere continuance of normal and peaceful duties, not performed with the specific purpose of aiding the enemy against the Allies or against the civil population of territory in enemy occupation, shall not be considered to constitute "voluntary assistance." Nor shall acts of general humanity, such as care of wounded or dying, be so considered except in cases where help of this nature given to enemy nationals could equally well have been given to Allied nationals purposely withheld from them.

IRO Constitution, 62 Stat. at 3052. Whether "continuance of normal and peaceful duties" refers to continued employment of individuals in positions with normal and peaceful duties, or performance of duties that continued to be normal and peaceful, is not clear. Therefore, given its burden of proof, the government failed to prove that this phrase would not exonerate Serge Kowalchuk, whose duties with the schutzmannschaft by self admission did not commence until after the German occupation. Indeed, the government has ignored this explanatory footnote in its entirety. Michael Thomas, upon whose testimony the majority rely in this matter, testified that if the normal and peaceful function of a police force continued after occupation, the

8. Furthermore, it is not at all clear from the evidence that the presumption spawned from the manual was actually in use at the time of Kowalchuk's visa application. The majority assert that the testimony of witnesses Thomas, Conan, and Hilberg "convincingly demonstrate that the defendant's voluntary membership in the schutzmannschaft constituted voluntary assistance to the enemy." At 494. But only Conan was an official with the Displaced Persons cant would have the burden of proving involuntariness. App. at 1512. Moreover, witness Conan, was an official with the Displaced Persons Commission for the British Zone of Germany, *id.* at 1509, and did not function in the United States occupied region of Austria where Kowalchuk's visa application was processed. *Id.* at 13, 586. His testimony cannot be as persuasive as that of other officials who testified on this issue.

Michael Thomas, who authored the IRO manual, was not as definite as Conan on whether membership in the schutzmannschaft shifted the burden of proof to an applicant to establish his lack of voluntariness. Although he initially so stated in his deposition, *id.* at 398, upon cross-examination he stated that membership in

a group such as the schutzmannschaft would only have alerted him to look for more facts. *Id.* at 431–32, 442–47. Thomas also stated that IRO certification practices, even after publication of the IRO manual, could vary from district to district. *Id.* at 425.

George Warren and John Chapin processed visa applications in the United States zone of Austria, during the time when Kowalchuk's application was processed there. *Id.* at 572–75, 1024–25. Warren actually signed Kowalchuk's certification of eligibility. *Id.* at 586. Both of these witnesses testified that membership in an organization such as the schutzmannschaft would only have caused suspicion and further investigation. *Id.* at 588, 602, 1050. Therefore, the weight of the evidence tends to show that membership in or employment by the schutzmannschaft alone would not have constituted "voluntary assistance to the enemy." The district court's factual conclusion that "[i]t is not at all clear that, in 1949, membership in the schutzmannschaft at Lubomyl would have precluded the issuance of a visa," 571 F.Supp. at 82, is therefore not clearly erroneous.

date of an individual's joining the force would not be critical in evaluating his eligibility for a visa under the constitution. App. at 429. Professor Hilberg also testified that local police forces sometimes were integrated into the schutzmannschaft, and that their normal duties might continue. *Id.* at 933–35, 943–44. Keeping in mind that in a denaturalization case, "the facts and the law should be construed as far as reasonably possible in favor of the citizen," *United States v. Anastasio,* 226 F.2d 912, 917 (3d Cir.1955) (footnotes omitted), *cert. denied,* 351 U.S. 931, 76 S.Ct. 787, 100 L.Ed. 1460 (1956), I conclude that the government did not prove by clear and convincing evidence that Kowalchuk did not qualify for a visa under § 2(b) note 1, of the IRO Constitution.

### C.

According to the IRO Constitution, appellant's duties may not have constituted voluntary assistance, absent some showing of an element of intent-to-aid, or "specific purpose of aiding the enemy," neither of which was proven by the government. The language difference between § 2(a) and § 2(b) of the IRO Constitution, and the language in the IRO manual supports this intent requirement. Section 2(a) of the IRO Constitution disqualifies persons who can be shown "(a) to have assisted the enemy in persecuting civil populations...." Section 2(b) speaks of persons who can be shown "(b) to have *voluntarily* assisted the enemy forces." (Emphasis supplied).

In *Fedorenko v. United States,* 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981), the Supreme Court ruled that the language difference between these two sections—the presence of "voluntarily" in § 2(b) and its absence in § 2(a)—produces a fundamental distinction in the burden of proof. In *Fedorenko* the Court ruled that under § 2(a) it was not necessary for the government to prove that the defendant *voluntarily* assisted the enemy in persecuting civilian populations, clearly implying that the government had to do so in making out a case under § 2(b): "That Congress was perfectly capable of adopting a "voluntari-

ness" limitation where it felt that one was necessary is plain from comparing § 2(a) with § 2(b)...." *Id.* at 512, 101 S.Ct. at 750.

Moreover, the definition of voluntariness contained in the explanatory footnote and the IRO manual establish an intent requirement. The footnote states that "[m]ere continuance of normal and peaceful duties, *not performed with the specific purpose of aiding the enemy* ... shall not be considered to constitute 'voluntary assistance.'" IRO Constitution, 62 Stat. at 3052 n. 1 (emphasis supplied). The IRO manual in paragraph 23 of Chapter VI clearly stipulates an intent requirement: "Such assistance to the enemy ... must have been voluntary, and given deliberately and of their own free will by the persons concerned, with the specific purpose of aiding the enemy in their military operations against the Allies." Govt.App. at 51. Therefore, as to § 2(b), the government must prove intent to assist. Proof of mere membership in the militia is insufficient. Because the government produced absolutely no other proof of intent to assist at trial, I find that it did not meet its heavy burden of proving voluntariness.

### VIII.

I now turn to the district court's conclusion that under § 2(a) appellant "assisted the enemy in persecuting civil populations." This conclusion is an ultimate finding and therefore merits the same analysis applied to the issue of voluntary assistance to the enemy. The difference between the § 2(a) and § 2(b) issue is that the government has a lesser burden in regard to § 2(a). The government need not prove, under § 2(a), that Kowalchuk voluntarily persecuted civil populations. As with § 2(b) the question of whether the basic facts prove the requisite assistance in persecuting civilian populations is one that implicates a legal component. Again, the issue is whether the government met its high burden of proof, proving by clear and convincing evidence that Kowalchuk persecuted the civilian population.

## A.

Appellant argues that he performed only clerical duties for the militia and that he, personally, was not involved actively in any persecutions. At this point, we must emphasize the findings of the district court as to basic and inferred facts. Specifically, the district court found that "defendant was responsible for the distribution of food and other supplies to persons entitled to receive the same by virtue of their employment as part of the local government...." *Kowalchuk,* 571 F.Supp. at 80. The court also found that "defendant did occupy a position of some responsibility with the schutzmannschaft. He had his own office there ...; he typed up and issued duty rosters; he typed the daily reports of police activity, etc. He probably wore a police uniform of some kind, during at least some of his duty hours at the police station." *Id.* at 81. Finally, the court noted "that the evidence is plainly insufficient to constitute clear and convincing proof of defendant's involvement in the massacre [of Lubomyl's Jewish population]." *Id.* These factual findings are not clearly erroneous. *See Krasnov v. Dinan,* 465 F.2d at 1302.

Significantly, the district court made no findings that appellant participated in any substantive decisions in either his food distribution or clerical position. Although Kowalchuk did distribute food, the evidence did not indicate that he decided to whom such distribution would be made. Although he admittedly typed the duty rosters, which included assigning patrols within the Jewish ghetto, the government did not prove that he decided who should go on these patrols, when they should occur, or even that they should occur at all. *See* Transcript of original panel oral argument at 42. Although Kowalchuk's position in the local militia was "of some responsibility," the responsibility was simply that of a clerk and not that of a decisionmaker. The government argues that this participation alone is sufficient to prove, by the requisite degree of certainty, that appellant was involved in persecuting the civilian population under § 2(a).

No reported case has yet held such a minimal level of involvement to be sufficient assistance in persecution of civilian populations to constitute grounds for denaturalization. The leading Supreme Court case is *Fedorenko v. United States,* 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981). In *Fedorenko,* the Court found that a person could be denaturalized where he failed to disclose on his visa application that he had been an armed guard at a Nazi concentration camp. The Court concluded, as a matter of law, that being an armed concentration camp guard constituted sufficient assistance in the persecution of civilians, that, had it been known at the time, would have precluded the issuance of a visa. 449 U.S. at 512–13, 101 S.Ct. at 750. By way of comparison, the Court speculated that "an individual who did no more than cut the hair of female [Jewish] inmates before they were executed [by the Nazis]" would not have been found to have assisted in the persecution of civilians. 449 U.S. at 512 n. 34, 101 S.Ct. at 750 n. 34. In *United States v. Dercacz,* 530 F.Supp. 1348 (E.D.N.Y.1982), sufficient evidence of assistance in persecution was found where the defendant was a uniformed Ukrainian militiaman who actually went on patrols and rounded up local Jews who violated restrictions. Finally, in *United States v. Osidach,* 513 F.Supp. 51 (E.D.Pa.1981), denaturalization was ordered upon proof that defendant was in the local militia, working as *both* a patrol officer and a clerk/interpreter.

The Court of Appeals of the Second Circuit recently held in a case similar to that before us, that a naturalized citizen who had served as an assistant police precinct chief in a Latvian town during the Nazi occupation had not assisted in the persecution of Jews or other civilians. *United States v. Sprogis,* 763 F.2d 115 (2d Cir. 1985). The court summarized the individual's activity:

It is true that Sprogis paid certain farmers who had already transported the [Jewish] prisoners to the police station and that he signed documents reflecting those payments. Sprogis also signed pa-

pers recording the disposition which the police had made of the prisoners' property. Finally, he was present at the police station during the detention of the prisoners and he allowed their incarceration to continue. However, these were not acts of oppression. They do not amount to the kind of active assistance in persecution which the DPA condemns.

*Id.* at 122. Also, in *Laipenieks v. I.N.S.,* 750 F.2d 1427, 1437 (9th Cir.1985), the behavior of a member of the Latvian Political Police, who assisted Nazis in investigating communists and "occasionally struck prisoners," did not constitute political persecution on the basis of political opinion under 8 U.S.C. § 1251(a)(19).

*Osidach,* therefore, represents the lowest level of activity that a federal court has found sufficient to constitute assistance in the persecution of civilian populations. I do not believe that appellant's conduct herein approaches that level of involvement. I believe it more analogous to that of the police officer in *Sprogis.*

### B.

The horrors of tyranny inflicted upon civil populations in territories controlled by occupying Nazi forces during World War II are so notorious that no citation is necessary. News accounts, official histories, and thousands of articles, dramas, novels, motion pictures, and television documentaries bear witness to this universal tragedy. Although the holocaust suffered by six million Jews is the apogee of Nazi degeneracy, the Nazis did not limit their ruthless murders, tortures, and terror to members of one particular religious faith. It is a matter of record that 20 million Soviet citizens—civilian and military—perished by the sword of the Third Reich. To a lesser numerical extent, Polish, French, Belgian, Danish and Italian civilians were slaughtered by random firing squads as punishment for violating rules of occupying armies.

Atrocities carried out by the Nazis against the general populations of occupied countries are further evidenced in a contemporaneous Czechoslovakian account:

The German terror ... expressed itself immediately.... From the first day [of occupation] mass arrests began among all classes of Czech society.... And so in the course of not quite two months some 12,000 Czechs found themselves in prison, to remain there for short or long terms; there were among them politicians, journalists, teachers and professors.... The persecution was, however, directed with special emphasis against the supporters of [the pre-occupation government], against judges, Social Democratic politicians and members of factory committees, and finally against officers of the former Czechoslovak army

....

Czechoslovak Ministry of Foreign Affairs, *Two Years of German Oppression in Czechoslovakia* 48 (Unwin Brothers Ltd., Great Britain 1941).

To facilitate their abilities to persecute local populations, the Nazis took special interest in the local police departments. The Nazis would oversee all police activities, maintaining more direct involvement in selected police functions, "especially in the sphere of the secret state police and the criminal police ... while internal security and public order ... [would be left] in principal to be maintained by the ... [local] police...." *Id.* at 32–33. As Nazi occupation continued, their control over the subject areas tightened and the suffering of local populations grew. Additional pressures were applied through the local police and, if the police resisted Nazi directives, pressure was applied directly on them. The Czech experience is, again, instructive. There, "[t]he German ferocity ... cruelly affected the leading officials of the Czech police. As they would not lend themselves to the persecution of their fellow-citizens and would not help in the barbarous treatment of the prisoners, they were themselves arrested and treated with incredible cruelty." *Id.* at 50.

The situation was even worse in the Ukraine than in other occupied areas. Nazi occupation there was particularly exploitive because the Ukraine figured in a long-term, large-scale German colonization scheme. I. Kamenetsky, *Hitler's Occupation of Ukraine (1941–1944)* 35–38 (Marquette University Press, Wisconsin 1956). While this colonization plan, or *Lebensraum,* was pursued throughout Eastern Europe it was applied with particular zeal in the Ukraine where the Nazis

> regarded all slavs as racially inferior, in fact subhuman, and intended to achieve German objectives not by sophisticated tactics, but by sheer brute force.... During the period of German occupation, Ukraine thus became a wretched laboratory ...—[with such experiments as] the mass extermination of the Jews, [and] the deportation and brutalization of Ukrainians—and the German colonization with its inherent feature of enslavement of the inhabitants and the exploitation of the country's resources. Ukraine suffered probably more than any other country....

Dmytro Doroshenko, *A Survey of Ukrainian History* 745 (Humeniuk Publication Foundation, Winnipeg 1975). Once the Nazis achieved control in the Ukraine they "launched a dual policy of annihilation of the politically and ethnically undesirable elements and the enslavement of the remainder." *Id.* at 748. As a result of their merciless techniques in pursuit of their goals of domination, "hundreds of thousands of Jews and Ukrainians ... were coldly and systematically butchered by the Nazis because they did not fit into Hitler's 'new order.'" *Id.*

### C.

Under this type of relentless pressure, and with the alternatives of arrest, torture, imprisonment, and death staring them in the face, it is hardly surprising that many inhabitants of occupied countries were passively accommodating to the Nazis. Many of these undoubtedly were government workers and civil servants who continued in or assumed government positions under Nazi occupation. Under these circumstances, if this large number of Europeans performed government or other service under Nazi occupation, no reasonable person would conclude that each of them "assisted in the persecution of civil populations" and would, thereby, be forever denied even the possibility of American citizenship. Can we say that the baker who delivered bread to the Lubomyl militia was guilty of assisting in Nazi persecutions? Or the char woman or janitor who cleaned the office where Kowalchuk toiled as a clerk? A line must be drawn. Although to do so is a very difficult, if not ultimately arbitrary, act, we are required to do so in this case whether we affirm or reverse the district court.

I believe that we should not extend the *Fedorenko-Dercacz-Osidach* line of cases to the facts presently before us. Further, consistent with Supreme Court doctrine, I am required by our own decision in *Anastasio* to resolve all doubts in favor of the citizen. Measured against this standard, I conclude that the government did not meet its high burden of proof on this issue either.

### IX.

This brings me to the final question of whether appellant's false statements about his residence and occupation during the war were misrepresentations of material facts sufficient to have denied him a visa under the DPA.

In bringing this action the government charged only misrepresentations by Kowalchuk concerning his military membership and his residence in Lubomyl. The district court, agreeing with at least some of the government's arguments, revoked Kowalchuk's citizenship on three grounds: (1) that as a member of the Lubomyl militia he voluntarily assisted the enemy; (2) that as a member of the Lubomyl militia he assisted the Nazis in persecuting civilian populations; and (3) that he made a willful, material misrepresentation of fact by lying

about his wartime residence and employment.[9]

## A.

Section 10 of the DPA provides in relevant part:

> Any person who shall willfully make a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person shall thereafter not be admissible into the United States.

62 Stat. 1013. In the development of case law, § 10 no longer can be considered in and of itself. At least since *Chaunt v. United States*, 364 U.S. 350, 81 S.Ct. 147, 5 L.Ed.2d 120 (1960), and especially since *Fedorenko v. United States*, 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981), this provision of the DPA must be analyzed in conjunction with § 2, which in turn incorporates §§ 2(a) and (b) of the IRO constitution. The Supreme Court has yet to decide whether the material facts test applied in naturalization applications also applies in visa applications. "[W]e find it unnecessary to resolve the question [of] whether *Chaunt's* materiality test also governs false statements in visa applications." *Fedorenko*, 449 U.S. at 509, 101 S.Ct. at 748. However, in naturalization proceedings the Court has stated that, to prove misrepresentation or concealment of a material fact, the Government must prove by clear and convincing evidence:

> either (1) that facts were suppressed which, if known, would have warranted denial of citizenship or (2) that their disclosure might have been useful in an investigation possibly leading to the discovery of other facts warranting denial of citizenship.

*Chaunt v. United States*, 364 U.S. 350, 355, 81 S.Ct. 147, 150, 5 L.Ed.2d 120 (1960). The first prong deals with cases where denial of citizenship could have been premised on the undisclosed information itself. The second prong deals with cases where the undisclosed information would not, in and of itself, justify denial of citizenship but where, had it been known, other facts could have been discovered justifying a denial of citizenship.

The government and I part company on our evaluation of both prongs. From my discussion of IRO § 2(a) "assisted the enemy in persecuting civil populations," and IRO § 2(b) "voluntarily assisted the enemy forces," in Parts VII. and VIII., *supra*, I conclude that the government did not satisfy the first prong of *Chaunt*. An analysis of the second prong, which the majority does not meet, is more difficult.

---

**9.** With respect to the misrepresentations, the majority decide to go much further than the district court. The majority state that appellant made five material misrepresentations concerning: his employment in the Lubomyl militia; his wartime residence in Lubomyl; his special schooling at German expense; his voluntary departure from Lubomyl with the German forces; and his membership in the Lubomyl militia. At 492–493. Because the majority fail to explain the difference between membership and employment in the Lubomyl militia, and because I see no difference of significance between the two contentions, I will proceed as though these were substantively the same misrepresentation.

As noted above, of these asserted misrepresentations, the district court expressly addressed only those concerning appellant's "residence in Lubomyl and his employment by the town government there during the German occupation." *Kowalchuk*, 571 F.Supp. at 81. Not surprisingly, the district court did not discuss appellant's special schooling or his departure from Lubomyl with the German army as material misrepresentations. First, the court did not find that appellant's leaving Lubomyl with the German army constituted voluntary departure with them. *See supra*, n. 1. The government does not assert that such a finding was error. Second, as to the special schooling issue, the government argued at trial, not that appellant's failure to disclose it was a material misrepresentation, but that it was "a complete fabrication," designed to provide appellant with an alibi for the time when the Nazis liquidated the Lubomyl ghetto. *Kowalchuk*, 571 F.Supp. at 76. Only the majority, not the government, asserts either of these two alleged misrepresentations as a basis for affirming the district court's order of denaturalization. Therefore, because the factual predicate for one was not found by the fact finder, because the other runs counter to the government's case in chief at trial, and because the government has not asserted either as an alternative rationale for affirming the district court, I choose not to address either here.

### B.

What has divided the courts of appeals in visa application cases is not the applicability of *Chaunt*, but rather the import of the second prong of *Chaunt's* denaturalization test. Some courts have held that, in visa cases, the government need only prove that, had the misrepresentation not been made, an investigation would have been conducted that *might* have uncovered facts warranting denial of a visa.[10] Other courts, including this one, require more. We require the government to prove not only that, had the correct information been available, an investigation would have been undertaken but that it *would* have uncovered facts warranting visa denial. *United States v. Riela*, 337 F.2d 986, 989 (3d Cir. 1964). *See also United States v. Sheshtawy*, 714 F.2d 1038, 1040–41 (10th Cir. 1983); *La Madrid-Peraza v. I.N.S.*, 492 F.2d 1297, 1298 (9th Cir.1974); *United States v. Rossi*, 299 F.2d 650, 652–53 (9th Cir.1962).

I believe that the most well-reasoned explication of the second prong of *Chaunt* is found in *United States v. Sheshtawy*, 714 F.2d 1038 (10th Cir.1983), which is the only court of appeals that has made an intelligent effort to discuss the consequences of adopting a literal meaning of the term "might" in *Chaunt*. The other cases do not contain such a "reasoned elaboration" for liberally construing the meaning of the term "might." *See United States v. Koziy*, 728 F.2d at 1320, *Kassab v. I.N.S.*, 364 F.2d at 807, *United States v. Oddo*, 314 F.2d at 118. The only case to provide any reasoned elaboration for holding that "might" should be read literally, relies simplistically on the reasoning that to hold otherwise would require the government to conduct an extensive investigation and would encourage an "applicant with something to hide" to lie to the I.N.S. *United States v. Fedorenko*, 597 F.2d at 951. The *Fedorenko* court, however, did not mention the alternative considerations, as did the

court in *Sheshtawy*. After considering all implications, the *Sheshtawy* court concluded: "We believe that the *Chaunt* Court considered this tension and, in effect, concluded that even though there may be some who are encouraged to lie, the importance of putting naturalized citizenship well beyond the danger of unwarranted revocation justifies the adoption of so severe a test." *Sheshtawy*, 714 F.2d at 1041.

The issue comes down to this: If this court, or any court, including the Supreme Court, adopts the literal meaning of one word "might," as contained in *Chaunt*, then one word will wipe out an entire galaxy of settled case law. Applied literally, all the second prong of *Chaunt* would appear to require the government to prove is that, had the truth been told, it "might have been useful" in a subsequent investigation and that investigation might "possibly lead[ ] to the discovery" of disqualifying facts. Thus read, *Chaunt* would undermine cases from *Schneiderman v. United States*, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943), to *Fedorenko v. United States*, 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981), which establish that citizenship, once granted, is a precious right; that, in a denaturalization proceeding, the government bears a heavy burden; that it must prove its case by clear, unequivocal, and convincing evidence, so as not to leave the issue unclear; and that, in such cases, all doubt is to be resolved in favor of the defendant.

*Chaunt* must be construed beyond the literal meaning of its language. The only significant Supreme Court explication is found in Justice Blackmun's concurrence in *Fedorenko*, which the Tenth Circuit relied upon in *Sheshtawy*. There, Justice Blackmun recognized the tension between the "Government's commitment to supervising the citizenship process and the naturalized citizen's interest in preserving his status." *Fedorenko*, 449 U.S. at 522, 101 S.Ct. at

---

**10.** *United States v. Koziy*, 728 F.2d 1314, 1319–20 (11th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 130, 83 L.Ed.2d 70 (1984); *United States v. Fedorenko*, 597 F.2d 946, 951 (5th Cir.1979); *Kas-*

*sab v. I.N.S.*, 364 F.2d 806, 807 (6th Cir.1966); *United States v. Oddo*, 314 F.2d 115, 118 (2d Cir.), *cert. denied,* 375 U.S. 833, 84 S.Ct. 50, 11 L.Ed.2d 63 (1963).

755 (Blackmun, J., concurring). He noted that when "the Government seeks to revoke [a grant of citizenship], the Court consistently and forcefully has held that it may do so only on scrupulously clear justification and proof." *Id.* at 523, 101 S.Ct. at 755. In addressing the second prong of *Chaunt,* Justice Blackmun concluded that it "indeed contemplated only this rigorous standard ...," *id.,* and that under this prong the government "must prove the existence of disqualifying facts, not simply facts that *might* lead to hypothesized disqualifying facts." *Id.* at 524, 101 S.Ct. at 756. Justice Blackmun ended by stating: "If naturalization can be revoked years or decades after it is conferred, on the mere suspicion that certain undisclosed facts *might* have warranted exclusion, I fear that the valued rights of citizenship are in danger of erosion." *Id.* at 525–26, 101 S.Ct. at 757.

I believe that Justice Blackmun's analysis is correct. To be consistent with the Supreme Court's prior and subsequent decisions, the second prong of *Chaunt* must be read as requiring proof, by clear, unequivocal and convincing evidence, of the existence of actual disqualifying facts. Thus, the government must prove that, had the undisclosed facts been known, an investigation would have been conducted and disqualifying facts would have been discovered.

### C.

By the district court's own determinations and our discussion in Parts VII. and VIII., *supra,* the government clearly did not meet its burden under the first prong of the *Chaunt* test. The district court determined that the government had not proved facts, which if known, would have warranted denial of Kowalchuk's visa. The district court declared that "[i]t is not at all clear that, in 1949, membership in ... [the militia] at Lubomyl would have precluded the issuance of a visa." *Kowalchuk,* 571 F.Supp. at 82.

With the first prong of the test eliminated, I turn to the second: if the facts had been disclosed would they have led to an investigation warranting denial? I have concluded that the government failed to prove that appellant's wartime activities constituted either voluntary assistance to the enemy or assistance in the persecution of civilian populations. No additional reliable evidence conclusively indicated that had the misrepresentations not been made appellant's visa application would have been rejected, at most, it indicates that it would have caused further investigation. Therefore, I would hold, as a matter of law, that the government has failed to prove by the requisite clear and convincing evidence that, had appellant divulged his actual wartime residence and occupation on his visa application, an investigation would have uncovered facts that would have resulted in the denial of the visa. Bound as I am by this court's precedent, not rejected by the Supreme Court in *Fedorenko,* I do not meet the question of what such an investigation *might* have uncovered.

### X.

Accordingly, I would reverse the district court's judgment on two separate grounds: (1) the court erred in concluding that the government met its burden in proving the violations of the Displaced Persons Act of 1948 as charged, and (2) the appellant was deprived rights guaranteed by the due process clause. I would reverse and remand these proceedings with a direction that judgment be entered in favor of the appellant.

HUNTER, Circuit Judge, with whom Judge Mansmann joins, dissenting:

I believe that the government did not meet its burden in this case. Accordingly, I concur in Chief Judge Aldisert's dissent and would reverse and remand with direction to enter judgment for appellant.

I join the Chief Judge's discussion in Parts V through IX which, in our view, clearly and fully disposes of the case. Therefore, I would not reach the due process grounds.